**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Tommy Dewayne Dobson** | ) | **Case No. 23-60148** |
| **Anne Christine Dobson,** | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

**SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
**OF TOMMY DEWAYNE DOBSON AND ANNE CHRISTINE DOBSON**

**<u>Summary of Relief Requested</u>**

Through this Second Amended Chapter 11 Plan of Reorganization (the "<u>Plan</u>" or the "<u>Second Amended Plan</u>"), Tommy Dewayne Dobson ("<u>Mr. Dobson</u>") and Anne Christine Dobson ("<u>Ms. Dobson</u>") (collectively, the "<u>Dobsons</u>" or the "<u>Debtors</u>") seek to confirm the Plan and obtain a discharge.  As briefly explained on the United States Courts' website, "[a] bankruptcy discharge releases the debtor from personal liability for certain specified types of debts. In other words, the debtor is no longer legally required to pay any debts that are discharged."[1]  The requirements for a subchapter V debtor to confirm a plan, whether consensually or non-consensually, are set forth in 11 U.S.C. §§ 1129(a) and 1191.  For a plan to be consensually confirmed, among other things, all classes of impaired claims and interests must vote to accept the plan.  An impaired class of claims votes to accept a plan when it is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.

**If all classes of impaired claims or interests vote to accept the Plan, the Debtors will receive a discharge of dischargeable debts upon confirmation of the Plan.  If any class of impaired claims or interests vote to reject the Plan, the Debtors will receive a discharge of**

---

[1] Available at https://www.uscourts.gov/services-forms/bankruptcy/bankruptcy-basics/discharge-bankruptcy-bankruptcy-basics#:~:text=The%20discharge%20is%20a%20permanent,%2C%20letters%2C%20and%20personal%20contacts (last accessed June 27, 2023).

**dischargeable debts after completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code.**

## Introduction and Background

The Debtors propose this Plan pursuant to § 1121(a) of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors filed their original Chapter plan of reorganization on June 2, 2023, (Dkt No. 84) (the "Original Plan").

Upon consideration of the objections of the United States Trustee filed June 8, 2023 (Dkt. No. 91) and Terry Lynn filed July 6, 2023 (Dkt No. 100), as well as the comments and concerns of William E. Callahan, Jr., subchapter V trustee for the Debtors (the "Subchapter V Trustee") and certain creditors, the Debtors elected to amend the Original Plan by filing their First Amended Chapter 11 Plan of Reorganization (the "First Amended Plan") on July 9, 2023 (Dkt No. 101). The First Amend Plan provided detailed information, as well as the Debtors' financial circumstances and ability to perform under the First Amended Plan. In addition, the Debtors' First Amended Plan provided special provisions that would compel the sale of their residence at 91 Beaver Dam Ct., Keswick, VA 22947 (the "Residence") in the event that the Debtors fall into default and are unable to cure such default under that First Amended Plan. The First Amended Plan also modified the secured claim of Atlantic Union Bank. Those provisions regarding default remedies and the secured claim of Atlantic Union Bank remain a part of this Plan in Sections 8.2 and 4.1.2, respectively.

Subsequent to the filing of the First Amended Plan, the United States Trustee filed a Motion to Convert Case on July 21, 2023 (Dkt. No. 110), and objections to confirmation of the First Amended Plan were filed by the United States Trustee and creditor, Terry Lynn, on August 10, 2023 (Dkt No. 119) and August 8, 2023 (Dkt No. 117), respectively (collectively, the "Objections"). In an effort to address certain concerns raised in the Objections, including specifically questions raised as to whether the Debtors First Amended Plan would satisfy the "fair and equitable" requirements of § 1191(b),[2] whether the Debtors should retain their Residence, and concerns regarding feasibility, the Debtors have elected to amend their First Amended Plan by filing this, their Second Amended Plan that requires the sale of their Residence to help fund the Plan and to address, in part, each of these issues and to explain how the Debtors hope to achieve confirmation in the event they do not receive sufficient votes in favor of their Plan.

If a subchapter V plan is not confirmed consensually under § 1191(a), then cramdown confirmation in a subchapter V case under § 1191(b) requires that the plan be "fair and equitable." Section 1191(c) provides a "rule of construction" for what is "fair and equitable" and describes three requirements to satisfy the condition that a plan be "fair and equitable" with respect to each class of claims or interests. First, it requires the commitment of projected

---

[2] All statutory references refer to Title 11 of the United States Code unless otherwise noted.

disposable income ("PDI"), or its value, for a period of three to five years, as the court determines under § 1191(c)(2)(A).  Second, it includes a "feasibility" requirement in § 1191(c)(3)(A).   Finally, the plan must provide "appropriate remedies" to protect holders of claims and interests if payments under the plan are not met in § 1191(c)(3)(B).

The commitment of PDI under § 1191(c)(2)(A) as required under subchapter V may be satisfied in one of two alternate ways.  The first method requires that the plan provide that "all of the projected disposable income to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix . . . be applied to make payments under the plan."  11 U.S.C. § 1191(c)(2)(A) (the "Periodic Payment Alternative").  The statute does not state how the court is to fix or determine the length of the commitment period of the PDI (the "PDI Period").  Section 1191(c)(2)(A) does provide, however, that the PDI Period begins on the date that the first payment is due under the plan.  The second alternative permits confirmation if "the value of the property to be distributed under the plan in [the PDI Period], beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor." 11 U.S.C. § 1191(c)(2)(B) (the "Value Alternative").

Accordingly, in an effort to satisfy certain concerns raised in the Objections and with an eye toward meeting the cramdown confirmation requirements of § 1191(b) in the event that this Plan is not confirmed consensually, the Debtors intend by the filing of this Plan to improve the feasibility of their Plan by requiring the sale of their Residence within 36 months of the Effective Date (defined below), to maintain appropriate remedies in the event of default, and to provide for the distribution of the value of the PDI for the PDI Period as fixed by the Court under the Plan. As such, the Debtors respectfully submit that that this Plan satisfies the Value Alternative for PDI if the Court fixes the PDI Period at the 3-year period referenced in § 1191(c)(2)(A).

Furthermore, the Debtors respectfully submit that the changes embodied in this Plan: (1) do not reduce the total amount to be paid under this Plan as compared to the First Amended Plan, and (2) accelerate the payment of the total to be paid under this Plan as compared to the First Amended Plan.  The Debtors request the re-balloting of this Plan in the event that these changes may garner votes in favor of the Plan such that consensual confirmation may be achieved.

This Plan makes other changes to the terms of the First Amended Plan not described in this Introduction and Background section of the Plan.  As such, all parties are encouraged to review all provision of the Plan carefully.

**A.**     **Description and History of the Debtors' Businesses, as well as Current and Future Business Operations and Risks**.

Mr. Dobson is the sole shareholder of Dobson Homes, Inc., a Virginia corporation that is no longer operating, and one of three shareholders of Plumb Line Foundations and Excavating, Inc. ("Plumb Line"), a Virginia corporation.  Dobson Homes, Inc., filed a chapter 7 bankruptcy the day after the Debtors' chapter 11 bankruptcy (the "Case") was filed on February 7, 2023 (the "Petition Date").  Following the filing of their Case, the Dobsons continued to operate and work for Plumb Line and to plan for the Debtors' new business operations initiated post-petition

handling design-build consulting work. On their amended Schedule A/B, Mr. Dobson valued his interest in Plumb Line as being worth $26,700.00 as of the Petition Date.

Subsequent to the filing of the Debtors' Case, though, Plumb Line faced problems with its licensing with Virginia DPOR. Just prior to the deadline for the filing of the Original Plan, Mr. Dobson and the other principals of Plumb Line determined that Plumb Line's operations needed to cease, at least temporarily, for the period while DPOR completes its review of Plumb Line's new licensing application. As such, the Debtors needed to secure other employment opportunities in order to provide stable income during the term of their Plan.

In order to help the Debtors in this regard, their friend and colleague, both personally and professionally, Mr. Samuel D. Craig, III, ("Mr. Craig") formed a new company, Corner Stone Foundations and Excavating, LLC ("Corner Stone"), that would employ the Debtors at compensation levels, through a combination of salary and bonuses and/or profit sharing opportunities, commensurate with what the Debtors were receiving and projecting to receive from Plumb Line and that would complete the same work that Plumb Line was previously completing. This was a relatively seamless transition for the Debtors and for the customers of Plumb Line because at the time of the change, all of the work being completed by Plumb Line was, in fact, for Mr. Craig's construction company, Craig Enterprises, Inc., d/b/a Craig Builders.

The Debtors do not have any ownership interest in Corner Stone, which is wholly owned by Mr. Craig and was formed by Mr. Craig on June 1, 2023. Mr. Craig has provided significant support to the Dobsons in terms of financial support, as well as through his long-term friendship with the Dobsons. While the Debtors intend to maintain the corporate status of Plumb Line even though currently it is not operating, the Debtors hope to resume operations with Plumb Line in the future and discontinue employment with Corner Stone once the licensing issues of Plumb Line are resolved. That said, the Debtors believe that this change from self-employment to wage employees with the opportunity for bonuses and/or profit sharing reduces the downside risks to the Debtors' income and increases the overall feasibility of their Plan. In addition, none of these changes impact the Debtors' efforts to continue to plan and operate their design-build consulting business to generate additional income to fund their Plan.

With respect to the design-build business, the Debtors are developing their new business currently but have not yet formed an entity for such operations. Until such time that they form an entity for this new business, the work is being undertaken by Mr. Dobson as a sole proprietor. The design-build business is in the beginning stages; however, Mr. Dobson has several potential clients identified who are ready to move forward to hire him (and one client hired Mr. Dobson as of the date of the First Amended Plan) as his schedule will permit. With respect to the first customer, Mr. Dobson was retained in June, 2023, through his design-build consulting business by Craig Builders to serve as a consultant for a 1.5 million dollar home renovation in Charlottesville. He received his first income from that engagement on July 7, 2023, and has received additional income monthly thereafter. Mr. Dobson was hired in the same capacity by a second customer, unrelated to Craig Builders, in July, 2023, to provide his design and consulting services for that customer's construction of a $500,000 to $700,000 project to build a barn, although no income has yet been received for that work. For all of Mr. Dobson's design-build consulting work, he will be compensated on a "cost-plus" model. In other words, he will be paid

a percentage, likely between 15-18% of the build cost, for his services. He will not handle the payment of any materials or other bills for the jobs. Those payments will be made by the contractor or owner. Mr. Dobson has other work identified after these projects but must be mindful of his available time to complete the work, so he is taking on new work only as he has the capacity to complete it properly.

**Risks to the Debtors' ability to perform under the Plan include, but are not limited to, Corner Stone terminating the Debtors' employment, Corner Stone terminating any lease with the Debtors, the failure of the design-build business to grow and meet projections, or Mr. Dobson's ability to work being negatively affected by criminal charges presently pending against Mr. Dobson as reflected in the Debtors' Amended Statement of Financial Affairs filed June 26, 2023, at Dkt No. 97. Although they have a verbal agreement, Corner Stone and the Debtors have not entered into a written lease related to the rents set forth in the projection of the future cash flow for the Debtors that is attached hereto as <u>Exhibit B</u>. Similarly, no written agreements have been entered into between Corner Stone and the Debtors related to the bonuses, reimbursements, or salaries set forth in Exhibit B, although verbal commitments are in place.**

The Debtors' financial problems leading to their Case stemmed from the failure and ultimate chapter 7 filing of Dobson Homes, Inc., and the claims made against the Debtors in their individual capacity resulting from that business's downfall. Those financial problems resulted in the Debtors filing their petition in this Case and electing to proceed under subchapter V of chapter 11 so that they may reorganize their debts and make payments to their creditors over time. The Debtors expect a positive turnaround financially post-petition, particularly with the move away from total reliance on self-employment income and with the ability to reorganize the claims against them in a manner that they can reasonably manage.

**B.      Liquidation Analysis.** A liquidation analysis for The Debtors is attached hereto as **<u>Exhibit A</u>.** In a liquidation of the Debtors in a chapter 7 case, priority and non-priority unsecured creditors would receive approximately **$271,331.00**. Holders of allowed unsecured claims are projected to receive more from this Plan than they would receive in a chapter 7 liquidation of the Debtors' assets. Under this plan, at least **$340,000.00** will be distributed to allowed priority and nonpriority unsecured claimants over the Plan Term (as defined in Section 1.1 below). The Debtors believe this is a conservative estimate. Assuming that: (a) the unclassified Administrative Expense and Professional Fee claims that must by paid from Plan Funding are $40,000.00 or less as the Debtors anticipate, and (b) the Class 4 claims are disallowed, then the amount available for distribution to the allowed priority and nonpriority unsecured claimants over the Plan Term would be at least **$390,00.00**.

**C.      Ability to Make Monthly Plan Payments & Operate Without Further Reorganization**. The Debtors believe that the restructuring of their obligations pursuant to this Plan will enable them to maintain a steady predictable stream of income to fund this Plan. Projections of the future cash flow for the Debtors are attached hereto as **<u>Exhibit B</u>**. Based on the Debtors' projections of future cash flows, the Debtors believe that they will be able to make all of the future payments required under this Plan and operate without the need for further reorganization.

D.    **Confirmation of the Debtors' Plan**.  The Debtors shall seek confirmation of the Plan under 11 U.S.C. § 1191(a) if all of the requirements of § 1129(a) are satisfied, including paragraph (8) requiring all impaired classes to have accepted the Plan but not including paragraph (15).  If any impaired classes do not accept the Plan, the Debtors shall request confirmation under the provisions of 11 U.S.C. § 1191(b).

**The Debtors anticipate that holders of claims and interests will receive a ballot to vote on this Plan unless the Court orders or directs otherwise.  If the Court enters an order setting forth deadlines to (i) vote on the Plan and to (ii) object to confirmation of the Plan, you will receive a copy of the order and you should carefully review it, and in that event, unless the Court orders otherwise, votes cast on any prior plan proposed by the Debtors do not count - you must return a ballot to David Cox, Esq., so as to be received on or before any deadline set  to vote for or against the Plan.  Ballots may be mailed to 900 Lakeside Drive, Lynchburg, Virginia 24501 or electronically mailed to david@coxlawgroup.com.**

For the avoidance of doubt, the Debtors' desire to confirm the Plan "consensually" under 11 U.S.C. § 1191(a), which would require, in part, that all impaired class to vote to accept the Plan. [3]  If, however, any impaired classes do not vote to accept the Plan, then the Debtors will seek confirmation of the Plan "nonconsensually" under 11 U.S.C. § 1191(b), a procedure commonly referred to as confirmation by "cramdown," the requirements of which are summarized below.

Under the cramdown rules of 11 U.S.C. § 1191(b), if all other confirmation standards are met, a bankruptcy court shall confirm a plan, on request of the debtor, if, with respect to each impaired class that has not accepted it, the plan (1) does not discriminate unfairly and (2) is fair and equitable.  Whether a plan is "fair and equitable" under 11 U.S.C. § 1191(c) is based, in part, on the satisfaction of a projected disposable income test, and § 1191(c)(2) sets forth two alternatives for satisfying this projected disposable income test.  Under either alternative, § 1191(c)(3) requires that (i) "[t]he debtor will be able to make all payments under the plan" or (ii) there is a reasonable likelihood the debtor will be able to make all payments under the plan and "the plan provides appropriate remedies . . . to protect the holders of claims or interests in the event that the payments are not made."

With respect to the options for satisfying the projected disposable income test, a plan may, under 11 U.S.C. § 1191(c)(2)(A), provide that all of the projected disposable income of the

---

[3] This paragraph and the remaining paragraphs of this section D of the Plan were added to the First Amended Chapter 11 Plan [Dkt No. 101] of the Debtors by a Supplement to First Amended Chapter 11 Plan filed July 12, 2023 [Dkt No. 104].  This section summarizes the cramdown confirmation rules of 11 U.S.C. § 1191(b) and paraphrase the text as to this topic in Judge Paul W. Bonapfel's treatise on subchapter V cases.  See, Hon. Paul W. Bonapfel, Guide to the Small Business Reorganization Act of 2019 at 137-149 (June 2022).  The full text of Judge Bonapfel's treatise may be found here:
https://www.alsb.uscourts.gov/sites/alsb/files/SBRA%20Guide%20June%202022%20Compilation%20FINAL.pdf
(last accessed July 11, 2023).

debtor to be received during the in 3-year period, or such longer period not to exceed 5 years as the court may fix, be applied to make payments under the plan.  In the alternative, under § 1191(c)(2)(B) a plan may provide that the value of property to be distributed under the plan within the three-year or longer period that the court fixes is not less than the projected disposable income of the debtor.[4]

The Bankruptcy Code does not define "projected disposable income," but it defines "disposable income" in 11 U.S.C. § 1191(d) as income that is received by the debtor and that is not "reasonably necessary to be expended" for these specified purposes: (1) the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation that first becomes payable after the date of the filing of the petition; or (2) for payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.

The Debtors assert that their budget projections in Exhibit B to the Plan are relevant to determining their projected disposable income under 11 U.S.C. § 1191(c)(2), and the Debtors intend to request confirmation under 11 U.S.C. § 1191(b) if all the applicable requirements of 11 U.S.C. § 1129(a) are met other than paragraphs (8), (10), and (15) of that section.

### Summary of Plan

This Plan under chapter 11 of the Bankruptcy Code proposes to pay creditors of the Debtors from their income and from the sale of their Residence as described in Article I.

This Plan provides for:          Three (3) classes of secured claims;
One (1) class of priority claims; and
One (1) class of non-priority unsecured claims.

Priority and non-priority unsecured creditors holding allowed claims will receive distributions in accordance with this Plan that exceed the amount such claims would receive in a Chapter 7 liquidation.  This Plan also provides for the payment of administrative claims and expenses and priority claims.

**Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one.  If you do not have an attorney, you may wish to consult one.**

---

[4] These alternatives are discussed in greater detail in the Introduction and Background section of the Plan.

## ARTICLE I
## Plan Payments, Overall Plan Funding, Distributions Agent, and Effective Date

1.1.     **Monthly Plan Payments**.  The Debtors shall submit such portion of their future income to the Plan as is necessary for the execution of the Plan in accordance with 11 U.S.C. § 1190(2).   Under this Plan, the Debtors shall make the following regular monthly plan payments (the "Monthly Plan Payments").  The Monthly Plan Payments represent the PDI required by 11 U.S.C. § 1191(c)(2)(A).   If the Court fixes the PDI Period at 3 years, the PDI under this Plan would be $259,500 (which is the sum of the Monthly Plan Payments below if continued for 36 months).  Notwithstanding this determination of PDI, the Monthly Plan Payments may continue for more or fewer months than 36, depending on the amount of the Lump Sum Payment (defined in Section 1.2 below).[5]

| Monthly Plan Payments | Start Date | Plan Term |
|---|---|---|
| $3500/month for 3 months, *then* $5000/month for 5 months, *then* $8000/month Until "Total Plan Payments" have been satisfied (defined in the Plan Term column to the right). | The first payment shall be due on the first day of the month following the first full month after the Effective Date (as defined in Section 1.9 below). | These Monthly Plan Payments shall continue until $451,500 has been paid between the Monthly Plan Payments and the "Lump Sum Payment" (defined and described in Section 1.2.2 below) (the "Total Plan Payments") (the "Plan Term"). |

1.2     **Lump Sum Payment**.  In addition to Monthly Plan Payments, the Debtors shall make a Lump Sum Payment from the sale of their Residence.

1.2.1. **Sale of Residence**.  On or before one year after the Effective Date, the Debtors shall file a motion with the Court that seeks to retain a real estate professional to market and sell their Residence.  In the event that the sale of the Residence is not closed within 32 months of the Effective Date, the Debtors shall, within 30 days thereafter file a motion with the Court that: (1) seeks to retain an auctioneer for the auction of their Residence, and (2) requires such auction to be completed and closed within 90 days of the Court-approved retention of the auctioneer.

---

[5] See section 1.5 for a further discussion of the impact of the determination of PDI and the PDI Period.

      1.2.2. **Proceeds from the Sale of the Residence**.  The nonexempt net proceeds of the sale of the Residence, up to the amount necessary to satisfy Total Plan Payments, shall be paid into the Plan (the "Lump Sum Payment"), credited against the Monthly Plan Payments otherwise due under the Plan, starting with the last Monthly Plan Payment due under the Plan, and distributed to allowed claimants in conformance with the terms of this Plan.  For the avoidance of doubt, the sale of the Residence under these provisions is expected to accelerate the completion of the Plan while still ensuring that regular Monthly Plan Payments are paid by the Debtors until Total Plan Payments are satisfied.  By way of example, if at the time of the sale of the Residence, the nonexempt net proceeds of sale are $304,000 and the balance of the Total Plan Payments is $384,000 because the Debtors have otherwise completed just their first 12 months of Monthly Plan Payments, the Debtor will pay into the Plan the Lump Sum Payment of $304,000 and distribute the same to the allowed claimants under the Plan and will still be required to continue making all regular Monthly Plan Payments until the remaining $80,000 of Total Plan Payments is satisfied.  Under this example, Monthly Plan Payments would be completed in 22 months (first 12 months of Monthly Plan Payments totaling $67,500 PLUS the Lump Sum Payment of $304,000 PLUS 10 final months of Monthly Plan Payments totaling $80,000 EQUALS the Total Plan Payments required under this Plan: $451,500).

      1.3.    **Subchapter V Payments**.  On February 9, 2023, the Court entered an Order Setting (A) Status Conference; (B) Claims Bar Date; (C) Deadline For Election Under 11 U.S.C. § 1111(b)(2); And (D) Other Deadlines (the "Subchapter V Order").  Consistent with the Subchapter V Order, the Debtors shall make payments to Debtors' counsel's trust account to be held for the benefit of the Subchapter V Trustee in the amount of $1000.00 per month (the "Sub V Payments") beginning March 16, 2023, and monthly thereafter through the determination of the Subchapter V Trustee's allowed compensation and reimbursement of expenses or until Monthly Plan Payments begin, whichever shall first occur.  The Subchapter V Trustee's allowed claim for compensation and reimbursement of expenses shall be determined in accordance with Article II of this Plan.

      1.4.    **Plan Funding**.  The sum of the Sub V Payments and the Total Plan Payments paid under the Plan will determine the overall plan funding ("Plan Funding").  The total of the Sub V Payments may not be calculated until the Plan is confirmed; however, if the Plan is confirmed in October, 2023, as the Debtor anticipates, then total Sub V Payments will be $9000.  In contrast, the Total Plan Payments is a precise figure: $451,500.  As Plan Funding is the sum of Sub V Payments and Total Plan Payments, the Plan Funding is estimated to be $460,500.  The Debtor may, in its sole discretion, prepay and complete early the Total Plan Payments required to satisfy Plan Funding at any time after confirmation of the Plan.

      1.5    **Nonconsensual Confirmation Standards, PDI and PDI Period**.  In the event that the Debtors are unable to achieve consensual confirmation and instead seek nonconsensual confirmation under § 1191(b), the Debtors submit that this Plan satisfies the requirements for the commitment of PDI under § 1191(c)(2)(A) under the Value Alternative test, for the following reasons.  As noted in Section 1.1, the Debtors assert the PDI is $259,500 if the PDI Period is fixed by the Court at 3 years.  The Total Plan Payments, however, is $451,000, which is a value that, even if discounted to the date on which the first distribution is due under the Plan, is far in excess of the PDI of the Debtors.  *See*, 11 U.S.C. § 1191(c)(2)(B).

1.5.   **Distributions To Allowed Claimants From Plan Funding**.  Unless otherwise indicated below, the Plan Funding shall be used to complete the distributions to the allowed claimants of unclassified claims under Article II of this Plan; to any allowed arrearage claims in Class 1 and Class 2; to the allowed secured claim in Class 3; and to the allowed priority and unsecured claims in Class 4 and Class 5.

1.6.   **Regular Contractual Payments Required In Class 1**.   Unless otherwise indicated below, the Debtors shall complete all regular contractual payments required under the applicable loan documents directly to the creditor in Class 1. These direct, contractual payments are in addition to the Debtors' obligation under this Plan to make Monthly Plan Payments and will in no way be paid from or be a credit to Plan Funding.

1.7.   **Regular AUB Payments Required In Class 2**.  Unless otherwise indicated below, the Debtors shall complete all Regula AUB Payments (as defined below) required under Section 4.1.2 of the Plan directly to the creditor in Class 2. These Regular AUB Payments are in addition to the Debtors' obligation under this Plan to make Monthly Plan Payments and will in no way be paid from or be a credit to Plan Funding.

1.8.   **Plan Distribution Agent.**   Regardless of whether this Plan is confirmed under 11 U.S.C. § 1191(a) or (b) and notwithstanding the language of 11 U.S.C. § 1194(b), the Debtors shall be the distribution agent for all distributions to claimants under this Plan.  In the event this Plan is confirmed under 11 U.S.C. § 1191(b), contemporaneous with each distribution under this Plan, the Debtors shall provide the Subchapter V Trustee with a declaration signed pursuant to 28 U.S.C. § 1746 stating that all required funds have been distributed or identifying any defaults. Additionally, after each distribution under this Plan, within seven days after issuance of the bank statement showing such distribution, the Debtors shall provide copies of bank statements to the Subchapter V Trustee if requested by the Subchapter V Trustee.

1.9.   **Effective Date**.  The effective date (the "<u>Effective Date</u>") of the Plan shall be 30 days after the date of the Order confirming this Plan (the "<u>Confirmation Order</u>").


## ARTICLE II
## Treatment of Unclassified Claims

2.1.  **Classification of Administrative Expense Claims**.   Administrative expense claims have not been classified and are excluded from the classes set forth in Article III of the Plan, in accordance with § 1123(a)(1) of the Bankruptcy Code.

2.2.  **Treatment of Administrative Expense Claims.**  Except to the extent that the holder of an allowed administrative expense claim agrees to less favorable treatment, each allowed administrative expense claim shall be paid in full from Plan Funding upon this Plan's Effective Date. If an administrative expense claim is allowed after the Effective Date of this Plan, such claim shall be paid in full from the Plan Funding within 30 days of its allowance or upon other terms as the parties may agree.

To the extent awarded or allowed by the Court under 11 U.S.C. § 330(a), the Subchapter V Trustee shall be paid for all fees and for the reimbursement of expenses as administrative expenses. The legal fees and expenses of Cox Law Group PLLC ("CLG") shall also be paid as administrative expenses to the extent allowed or approved by the Court but not satisfied from the retainer (the "Retainer") provided to CLG prepetition as disclosed in its Rule 2016(b) Statement filed on February 20, 2023 (Dkt No. 18). These fees shall be paid in full upon the Effective Date of the Plan and from Plan Funding to the extent the fees have been allowed by the Court or upon such alternate terms as the professional may agree. In satisfying the allowed administrative expense claims of the Subchapter V Trustee and CLG, the portion of the Plan Funding allocated to the Sub V Payments shall first be applied exclusively to the Subchapter V Trustee's allowed claim, with any balance remaining thereafter applied to the allowed claim of CLG not otherwise satisfied by the Retainer.  Although the allowance of the fees and costs of CLG are subject to the review and approval of the Court, CLG estimates that its fees will be approximately $105,000 through the Effective Date of this Plan or more, depending on the extent that the Plan's confirmation and/or the claim objections contemplated in section 4.1.4 are contested.   This is an estimate only and may ultimately be higher or lower than such amount.

Professional fees incurred following the Effective Date of the Plan shall be paid directly by the Debtors and shall not require court approval or allowance.

2.3.   **Administrative Expense Claim Bar Date**.  Requests for payment of administrative expense claims existing as of the Effective Date this Plan must be filed with the Bankruptcy Court and served on the Debtors no later than forty-five (45) days after the Effective Date.

**Any entity that is required to, but fails, to file a request for allowance of an administrative expense claim on or before the deadline referenced above shall be forever barred from asserting such administrative expense claim against the Debtors, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover amounts asserted against the Debtors for such administrative expense claim.**

2.4.   **Professional Fee Claims**.  All professionals employed in this case pursuant to §§ 327, 328, or 1103 of the Bankruptcy Code, and/or the Subchapter V Trustee who may seek an award of a professional fee claim incurred through and including the Effective Date shall, unless otherwise ordered by the Bankruptcy Court, file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is no later than forty-five (45) days after the Effective Date.

2.5.   **Priority Tax Claims**.  Each of the priority creditors under 11 U.S.C. § 507(a)(8) will receive on account of its allowed claim regular installment payments from Plan Funding in cash— (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief under 11 U.S.C. §§ 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under 11 U.S.C. § 1122(b)). To comply with the requirements of 11 U.S.C. § 1129(a)(9)(C), interest will be paid on the allowed claims at the rates noted below.

| Creditor | Estimated Priority Claim | Interest Rate | Start Date and Term of Repayment |
|---|---|---|---|
| Internal Revenue Service (Proof of Claim No. 12) | $173,397.41 | 7% | To begin on the first day of the month following the first full month after the Effective Date and continue for 60 months or until paid in full |

## ARTICLE III
## Classification of Claims and Interests

The Debtors' creditors shall be classified into the following Classes:

3.1.  **Class 1**.  Class 1 consists of the secured claim of Shellpoint Mortgage Servicing (Proof of Claim No. 40).

3.2  **Class 2**.  Class 2 consists of the secured claim of Atlantic Union Bank (Proof of Claim No. 46).

3.3  **Class 3**.   Class 3 consists of the secured claim of Louisa County Treasurer (Proof of Clam No. 49).

3.3.  **Class 4.**  Class 4 consists of allowed priority claimants under 11 U.S.C. § 507(a)(7)  (collectively, the "Section 507(a)(7) Creditors").

3.3.  **Class 5.**  Class 5 consists of general unsecured creditors (collectively, the "Unsecured Creditors").

3.4.  **Elimination of Classes for Voting Purposes.**  Any class of claims or equity interests that is not populated as of the date of the commencement of the confirmation hearing by an allowed claim or an allowed equity interest, as applicable, or a claim or equity interest, as applicable, in such class temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed deleted from the Plan for purposes of voting to accept or reject the Plan by any such class under § 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV
## Treatment of Claims and Equity Interests

4.1.  The classes of allowed claims and interests will receive the following treatments under the Plan.

4.1.1.  **Class 1: Shellpoint Mortgage Servicing's Secured Claim**.  The creditor listed below will be paid directly by the Debtors pursuant to the applicable loan documents without modification. For the avoidance of doubt, the Debtors shall pay the regular contractual payments required below directly to the creditor. These direct, contractual payments are in addition to the Debtors' obligation under this Plan to make Monthly Plan Payments and will in no way be paid from Plan Funding.   Any allowed arrearage claim (expected in this Class 1 to be $7669.67) shall be satisfied from Plan Funding.

| Creditor | Collateral | Arrearages | Arrearage Interest Rate | Payment Terms for Arrears | Regular Contract Payment |
|---|---|---|---|---|---|
| Shellpoint Mortgage Servicing | 91 Beaver Dam Ct, Keswick, VA 22947 | $7669.67 | 0% | Shall be paid in full within 12 months of the Effective Date | $5665.85 per mo starting March 2023 |

**Class 1 is impaired by the Plan**.

4.1.2  **Class 2: Atlantic Union Bank's Secured Claim**. The loan documents establishing the secured claim of Atlantic Union Bank are memorialized by a deed of trust dated August 21, 2017, (the "DOT") encumbering the Debtors' real estate at 91 Beaver Dam Ct., Keswick, VA 22947, and a note dated July 27, 2021 (the "Note") requiring payments of $1897.00 per month for 36 months (the "Original Loan Term") with 4.5% interest per annum based on a year of 360 days, until paid in full, beginning with a first payment due July 31, 2021, and a final payment of the remaining balance due on July 31, 2024 (the "Balloon Payment").

Atlantic Union Bank will be paid directly by the Debtors pursuant to the terms of the Note and DOT, with the exception of the following modifications in accordance with 11 U.S.C. § 1190(3):  The due date of the Balloon Payment is modified from July 1, 2024, to July 1, 2029, and the Original Loan Term shall be modified from 36 months to 96 months. Accordingly, under this Plan the Debtors shall pay $1897.00 (the "Regular AUB Payment") each month beginning July 31, 2023, for the remaining 72 months of the loan's term, as modified by this Plan, and then pay the Balloon Payment due July 31, 2029.

For the avoidance of doubt, the Debtors shall pay the Regular AUB Payments required below directly to the creditor. These direct, contractual payments are in addition to the Debtors' obligation under this Plan to make Monthly Plan Payments and will in no way be paid from Plan Funding.  The allowed prepetition and postpetition arrearage claims (expected in this Class 2 to be $9485.00 pre-petition,  plus $7588.00 post-petition) shall be satisfied from Plan Funding.

| Creditor | Collateral | Arrearages | Arrearage Interest Rate | Payment Terms for Arrears | Regular AUB Payment |
|---|---|---|---|---|---|
| Atlantic Union Bank Proof of Claim No. 45 | 91 Beaver Dam Ct, Keswick, VA 22947 | $9485.00 pre-petition, plus $7588.00 post-petition | 0% | Shall be paid in full within 12 months of the Effective Date | $1897.00 per mo Starting July 31, 2023 |

**Class 2 is impaired by the Plan**.


4.1.3.  **Class 3: Louisa County Treasurer's Secured Claim**.  The allowed secured claim of Louisa County Treasurer, estimated to be $1744.41 in accordance with Proof of Claim No. 49, is a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under § 507(a)(8), but for the secured status of the claim, and shall therefore be paid in accordance with § 1129(a)(9)(C) as follows.  The Louisa County Treasurer will receive on account of its claim regular installment payments in cash with 10% interest to ensure it receives payments (i) of a total value, as of the Effective Date of the plan, equal to the allowed amount of such claim; (ii) over the Plan Term, which will be a period ending not later than 5 years after the date of the order for relief under §§ 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under § 1122(b).

**Class 3 is not impaired by the Plan**.


4.1.4.  **Class 4: Section 507(a)(7) Creditors**.  Consistent with 11 U.S.C. § 1129(a)(9)(B), each of the following Class 4 priority creditors under 11 U.S.C. § 507(a)(7), to the extent its claim is allowed, will receive on account of its allowed claim either: (i) deferred cash payments of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim if such class has accepted the plan; or (ii) if such class has not accepted the plan, cash on the Effective Date of the plan equal to the allowed amount of such claim.  To comply with the requirements of 11 U.S.C. § 1129(a)(9)(B)(i), interest will be paid on the allowed claims at the rates noted below.   Notwithstanding this provision, the Debtors take the position that the claims of the Class 4 creditors should be disallowed because in each case the Debtors did not receive a deposit of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.  Unless such claims are amended to remove their designations as priority claims under 11 U.S.C. § 507(a)(7), the Debtors intend to object to the allowance of the claims of each of the Class 4 creditors on or before the Effective Date and notice the same for hearings.

  
| Creditor | Type of Priority | Claim | Interest Rate |
|---|---|---|---|
| David Roberts & David Spencer  (POC #25) | 11 U.S.C. § 507(a)(7) | $3,350.00 | 7.0% |
| Aric & Lara Holsinger (POC #26) | 11 U.S.C. § 507(a)(7) | $3,350.00 | 7.0% |
| Thomas & Sally Daly (POC #28) | 11 U.S.C. § 507(a)(7) | $3,350.00 | 7.0% |
| Juanita Haydel (POC #30) | 11 U.S.C. § 507(a)(7) | $3,350.00 | 7.0% |
| Roy & Mary Whitley (POC #31) | 11 U.S.C. § 507(a)(7) | $3,350.00 | 7.0% |
| Chris & Helen Karls (POC #32) | 11 U.S.C. § 507(a)(7) | $3,350.00 | 7.0% |
| Steve & Barbara Ryan (POC #44) | 11 U.S.C. § 507(a)(7) | $3,350.00 | 7.0% |

**Class 4 is impaired by the Plan**.


4.1.5.  **Class 5: Unsecured Creditors**.  Class 5 includes all unsecured creditors.

Distributions will be made from Plan Funding to the allowed unsecured claims, pro rata, in Class 5.

Such distributions, to be shared among the entire class of holders of allowed unsecured claims, will be, in fact, an amount in excess of the amount that such holders would receive or retain if the Debtors were liquidated under a chapter 7 bankruptcy.

**Class 5 is impaired by the Plan.**


## ARTICLE V
## Acceptance or Rejection of the Plan

5.1.  **Impaired Classes of Claims Entitled to Vote**.  Creditors in Classes 1, 2, 4, and 5 are impaired by the Plan and are thus entitled to vote to accept or reject the Plan.

5.2.  **Presumed Acceptance by Unimpaired Classes**.  Class 3 is unimpaired by the Plan and conclusively presumed to accept the Plan under § 1126(f) of the Bankruptcy Code.

5.3.  **Classes Deemed to Reject Plan**.  No Classes of claims or interests are deemed to reject the Plan.

## ARTICLE VI
## Means of Execution and Implementation of the Plan

6.1.    **Funding of Debtors' Plan & Rights and Powers of Debtors**.  The Debtors will fund their Plan from their wages and business income and as otherwise set forth in this Plan. Upon and after the Effective Date, the reorganized Debtors shall have all powers provided for under this Plan and the Confirmation Order and shall have all of the powers provided by § 1184 of the Bankruptcy Code. The Debtors' disposable income shall be utilized to complete the Monthly Plan Payments.

6.2.    **Revesting of Estate Assets in the Reorganized Debtors**.  On the Effective Date, all assets of the Debtors' estate shall revest in the reorganized Debtors, subject to the liens of the holders of Class 1 and Class 2 claims that are not released or avoided, but otherwise free and clear of all other liens, claims, interests, and encumbrances, except as otherwise provided by 11 U.S.C. §§ 1141(d)(2) and 1141(d)(3). In furtherance of the implementation of the Plan, absent further order of this Court, all other estate property revesting in the reorganized Debtors shall be used in accordance with the terms of this Plan and shall not be subject to garnishment, attachment, and/or other similar process by any prepetition creditors without first complying with the terms of this Plan.

6.3.    **Causes of Action**.  All claims and causes of action held by the Debtors shall vest in the reorganized Debtors on the Effective Date, and the reorganized Debtors shall have full power and authority to pursue such claims and causes of action for the benefit of his creditors and the estate.  The proceeds of all claims and causes of action, including Avoidance Actions as defined below, shall be distributed in accordance with this Plan to allowed claimants and included as part of the overall Plan Funding.  Settlements of claims and causes of action following the Effective Date shall not be subject to approval by the Bankruptcy Court.  For purposes of this Plan, the Debtors are evaluating potential avoidance actions to include any causes of action arising under Bankruptcy Code §§ 510, 541, 542, 544, 545, 547 through 551 and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws (the "Avoidance Actions").  The Debtors are not currently pursuing any Avoidance Actions.  Notwithstanding the foregoing, nothing herein shall serve as a waiver of the Debtors' right to pursue any Avoidance Action against any creditor or party in the event that Debtors reevaluate such potential claims or actions or otherwise determines that pursuing such Avoidance Action is appropriate in its business judgment.

6.4.    **Sale of Personal Property**.  The Debtors will sell any personal property that it determines in its business judgment to be unnecessary to the reorganization of the Debtors.  After paying the costs of such sale, the proceeds of the sale will be applied to any liens of record against such property, and any remainder will be held by the Debtors and may be utilized to satisfy Plan Funding.  The Debtors have not made any final determinations of which personal property, if any, will be sold by the Debtors pursuant to this section.

6.5.    **Effectuating Documents and Further Transactions**.  The Debtors and/or reorganized Debtors shall be authorized to execute, deliver, file or record such stipulations, contracts, leases, amendments, instruments, releases and other agreements or documents and take

such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

In addition, the Debtors, upon the Confirmation Order becoming a final order, is authorized but not required, without further notice or order, to refinance and/or sell to one or more entities any of its assets; provided, however, that any holder of a security interest in any asset sold that has not been avoided shall retain its lien on such assets, and the Debtors shall obtain the consent of such lienholder for such sale unless the holder of such lien shall receive payment in full of the remaining amount of its allowed secured claim. Furthermore, pursuant to § 1142(b) of the Bankruptcy Code, any necessary party and/or parties will be directed by the Court to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by this Plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the Plan.  For the avoidance of doubt, the reorganized Debtors are authorized to enter into, modify or amend loan documents and related agreements and record new financing statements or amend existing financing statements in furtherance of the terms of the Plan and the treatment of the claims hereunder. **Notwithstanding the foregoing, if the Debtors may not sell the Residence without approval of this Court, and the Debtors may not refinance any loan secured by the Residence without approval of this Court.**

6.6.   **Releases of Record**.   Upon the request of the Debtors and/or reorganized Debtors, any entity (1) that is entitled to receive any distribution under this Plan and/or (2) whose lien (or purported lien) is extinguished or modified pursuant to this Plan or other order of the Court, shall execute and deliver promptly such documents and instruments as are necessary to release or modify of record any lien, to the extent such lien is extinguished or modified pursuant to this Plan. Notwithstanding any provision in this Plan, the Debtors and/or reorganized Debtors shall not be required to make any distribution, or deliver any document or instrument, to such entity, unless and until such entity has complied with this obligation. To the extent such entity fails to execute and deliver such documents within 30 days of the Effective Date, the reorganized Debtors are authorized to execute and deliver such documents or take such other appropriate action to ensure the release or modification of such lien is of record. The obligations set forth in this paragraph shall not be waived by any action or inaction of the Debtors and/or reorganized Debtors, including without limitation commencement of distributions to the affected entity.


## ARTICLE VII
## Distributions

7.1.   **Debtors**.   The Debtors shall have all rights, duties and powers set forth in the Plan, including, without limitation, the duty to review and object to claims and make distributions pursuant to the terms of this Plan and the Confirmation Order.  The Debtors shall have all the powers of a trustee under the Bankruptcy Code.  On or after the Effective Date, the Debtors may employ counsel and other professionals as may be reasonably necessary for its operations and to execute the Plan without the necessity of application to the Bankruptcy Court.

Such professionals may be retained and compensated for post-Effective Date services in the ordinary course without the necessity of application to the Bankruptcy Court.

7.2. **Delivery of Distributions**. Following the Effective Date, distributions under this Plan shall be made from Plan Funding, unless otherwise indicated in the Plan. Subject to Bankruptcy Rule 9010, unless otherwise provided herein, all distributions to any holder of an allowed claim shall be made at the address of such holder as set forth on the bankruptcy schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, unless the Debtors have been notified in advance and in writing of a change of address, including, without limitation, by the filing of a proof of claim by such holder. In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtors have been notified by such holder of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such holder; *provided*, *however*, that such distributions shall be deemed unclaimed property under § 347(b) of the Bankruptcy Code at the expiration of one (1) year from the date such distribution is returned. After such date, all unclaimed property shall revert to the Debtors. The Debtors shall not have any obligation to attempt to locate any holder of an allowed Claim other than by reviewing its books and records (including any proofs of claim or interest filed in the Chapter 11 case).

7.3. **Stop Payments; Minimum Distribution**. The Debtors may stop payment on any distribution check that has not cleared the payer bank within ninety (90) days of the date of distribution of such check. No distribution under the sum of $10.00 is required to be made by the Debtors.

7.4. **Prepayment**. Except as otherwise expressly provided in this Plan or the Confirmation Order, the Debtors and/or reorganized Debtors shall have the right to prepay, without penalty, all, or any portion of the distributions owed to an allowed claim, at any time.

7.5. **Interest on Claims**. Unless: (a) otherwise specifically provided for in this Plan, (b) other order of the Court, (c) pursuant to an agreement to pay adequate protection to the holder of a secured claim, or (d) the Confirmation Order, post-petition interest shall not accrue or be paid on any claim, and no holder of an allowed claim shall be entitled to interest accruing on or after the Petition Date on any claim.

## ARTICLE VIII
### Confirmation, Default Remedies and Discharge

8.1. **Binding Effect of Confirmation**. On and after the Effective Date, the provisions of the Plan shall bind any holder of a claim against the Debtors and such holder's respective successors and assigns, whether or not the claim or interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan, except as otherwise provided by 11 U.S.C. §§ 1141(d)(2) and 1141(d)(3).

8.2.    **Post-Petition Default by Debtors**.  The occurrence of any of the following shall constitute an event of default ("Event of Default") under the Plan:

a.    The failure of the Debtors to make any payment or distribution when due under the Plan, which failure shall continue for a period of thirty (30) days or more after written notice from a creditor or the Subchapter V Trustee to the Debtors and Debtors' counsel (in accordance with section 10.8 of this Plan if the notice is from a creditor or the Subchapter V Trustee) and also to the Subchapter V Trustee (if the notice is from a creditor) regarding the default; and,

b.    The failure of the Debtors to comply with any of the covenants contained in the Plan, which failure remains uncured for a period of thirty (30) days or more after written notice from a creditor or the Subchapter V Trustee regarding the default to the Debtors, Debtors' counsel and, if the written notice is from a creditor, to the Subchapter V Trustee.

Upon the occurrence of an Event of Default under the Plan which is not excused, postponed, modified or waived by Order of the Court or by written agreement of all affected creditors and which has not been cured within any applicable time period, interest shall accrue at the rate of three percent (3%) per annum on each unpaid obligation under the Plan, which has been declared in default, commencing from the date said payment or distribution was due under the Plan. The creditor shall be entitled to utilize its federal or state law remedies to collect such debt otherwise due under the Plan. Nothing set forth herein shall limit the ability of parties in interest from seeking conversion or dismissal of this case under 11 U.S.C. §1112, or other remedies that may be available under the Bankruptcy Code, in the event of a default under the Plan.

In addition, upon the occurrence of an Event of Default under the Plan which is not excused, postponed, modified or waived by Order of the Court or by written agreement of all affected creditors and which has not been cured within any applicable time period, the Debtors shall, within 30 days thereafter file a motion with the Court that: (1) seeks to retain an auctioneer for the sale of their Residence, and (2) requires such sale to be completed within 60 days of the Court-approved retention of the auctioneer.  Upon the completion of the auction, the Debtors shall petition the Court for the approval of the same and shall apply all nonexempt net proceeds from such sale, up to the amount necessary to satisfy Total Plan Payments at that time, to the Plan Funding under this Plan in order to speed the completion of the Plan's administration and to ensure all such nonexempt funds are devoted to the creditors under the Plan.

8.3.    **Discharge**.  If the Debtors' Plan is confirmed under 11 U.S.C. § 1191(a), on the Effective Date, the Debtors will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtors will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent excepted under 11 U.S.C. §523.

If the Debtors' Plan is confirmed under 11 U.S.C. §1191(b), confirmation of this Plan shall not discharge any debt provided for in this Plan until the Court grants a discharge upon completion of all payments due within the first 3 years of this Plan, or as otherwise provided in §

1192 of the Bankruptcy Code.  The Debtors will not be discharged from any debt: (i) on which the last payment is due after the first 3 years of the Plan, or as otherwise provided in 11 U.S.C. § 1192; or (ii) excepted from discharge under § 523(a) of the Bankruptcy Code.

## ARTICLE IX
### Leases and Executory Contracts

9.1.    **Rejection of Unexpired Leases and Executory Contracts**.   With the exception of the following unexpired leases and executory contracts, upon confirmation of the Plan, all of the Debtors' other unexpired leases and executory contracts shall be deemed to be rejected.

| Lessee | Lease Description | Lease Terms | Lease Payment |
|---|---|---|---|
| Corner Stone | Debtor rents out basement in Residence as office to Corner Stone | Month to Month | $2965.82 per month |

9.2.  **Claims Arising from Rejection**.  Unless the time for filing claims is otherwise fixed by the Bankruptcy Court, all claims arising from the rejection of executory contracts or unexpired leases shall be filed and served upon the Debtors and the United States Trustee within thirty (30) days after the later of (i) entry of a final order authorizing such rejection or (ii) the date on which the Confirmation Order becomes a final order.  Any such claim not filed within the required time period shall be time-barred and shall not be an allowed claim.

## ARTICLE X
### Miscellaneous Provisions

10.1.  **Headings**.  The headings used herein are inserted for convenience only and neither constitute a substantive portion hereof nor in any manner affect the provisions hereof.

10.2.  **Successors and Assigns**.  The rights, benefits and obligations of any person or entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such person or entity.

10.3.  **Correction of Errors; Inconsistencies**.  Before or after the confirmation hearing(s), or in the Confirmation Order, the Debtors may, after providing adequate notice and

with the approval of the Bankruptcy Court, so long as it does not materially and adversely affect the interests of creditors who have accepted this Plan, remedy any defect or omission, or reconcile any inconsistencies in this Plan or amend this Plan, in such a manner as may be necessary to carry out the purposes and the effect of this Plan without the necessity of re-soliciting acceptances.

10.4.   **Objections to Claims.**   The Debtors may file with the Bankruptcy Court an objection to the allowance of any claim, or any other appropriate motion or adversary proceeding with respect thereto.  All such objections will be filed on or within 90 days following the entry of an Order confirming this Plan (the "Claims Objection Deadline") unless the Debtors seeks and obtains an extension of the Claims Objection Deadline.

10.5.   **Termination of Subchapter V Trustee**.  If the Plan is confirmed under § 1191(a) of the Bankruptcy Code, the service of the Subchapter V Trustee in the case shall terminate when the Plan has been substantially consummated, except that the United States Trustee may reappoint a subchapter V trustee as needed for performance of duties under §§ 1183(b)(3)(C) and 1185(a) of the Bankruptcy Code. If the Plan is not accepted by all impaired class and is confirmed under § 1191(b) of the Bankruptcy Code, the Subchapter V Trustee in the Case will continue to serve; however, the Debtors will make the distributions to creditors under the Plan, subject to the conditions and requirements of section 1.8.

10.6.   **Retention of Jurisdiction**.  The Bankruptcy Court shall retain jurisdiction after confirmation of the Plan for the following purposes:

(i)      to determine the allowance and classification of any claim or equity interest, the reexamination of claims or equity interests which have been allowed for purposes of voting, and the determination of any objections to claims or equity interests that may be or may have been filed;

(ii)     to determine motions to estimate claims at any time, regardless of whether the claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

(iii)    to determine motions to subordinate claims or equity interests at any time and on any basis permitted by applicable law;

(iv)     to construe or take any action to enforce this Plan and to issue such orders as may be necessary for the implementation, execution, and consummation of this Plan;

(v)      to determine any and all applications for allowance of compensation or reimbursement of expenses of professionals;

(vi)     to determine any other requests for payment of administrative expense claims;

(vii)    to resolve any disputes arising under or relating to this Plan;

(viii)   to modify the Plan, to the extent permitted by the Bankruptcy Code;

(ix)    to take any action to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan;

(x)    to enter any order, including injunctions, necessary to enforce the rights, title and powers of the Debtors and to impose such limitations, restrictions, terms and conditions of such rights, title and powers as the Bankruptcy Court may deem necessary;

(xi)    to enforce any order previously entered by the Bankruptcy Court in this Case and to enter the closing order;

(xii)    to determine pending applications for the assumption or rejection of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine, and if need be, to adjudicate any and all claims arising therefrom;

(xiii)    to determine applications, adversary proceedings and contested or litigated matters and all causes of action, whether pending on the Effective Date or commenced thereafter, arising under the Bankruptcy Code, or arising in or related to the Case;

(xiv)    to issue orders in aid of execution of the Plan to the extent authorized by § 1142 of the Bankruptcy Code;

(xv)    to determine such other matters as may be set forth in the Confirmation Order;

(xvi)    to consider and act on the compromise and settlement of any claim against, or cause of action on behalf of, the Debtors or its estate;

(xvii)    to enter such orders as may be necessary or appropriate in connection with the Debtors or its assets, wherever located;

(xviii)    to hear and determine matters involving Federal, state and local taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

(xix)    to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with this Chapter 11 case or the Plan;

(xx)    to enter such orders as may be necessary or appropriate to aid confirmation of and to facilitate implementation of the Plan; and

(xxi)    to determine any matter not inconsistent with the Bankruptcy Code or the Plan.

10.7.    **Entry of Final Decree and Closing of Case.**  Once the Debtors have substantially consummated the Plan, they shall file a certification of the same and apply for the entry of final decree, as appropriate.

10.8.    **Notice to Debtors**.  In the event notice is required to be provided under this Plan to the Debtors, such notice shall be completed: (1) by email to the Debtors and Debtors' counsel at david@coxlawgroup.com, tommydobson73@gmail.com, and christinedobson68@gmail.com, and (2) by U.S. Mail, first class, postage prepaid, to: Tommy and Christine Dobson, 91 Beaver Dam Ct., Keswick, VA 22947.


September 13, 2023                          Respectfully submitted,
                                            /s/ Anne Christine Dobson
                                            /s/ Tommy Dewayne Dobson

/s/ David Cox
David Cox (Virginia Bar No. 38670)
COX LAW GROUP, PLLC
900 Lakeside Drive
Lynchburg, VA 24501
david@coxlawgroup.com
(434) 845-2600
*Counsel for the Debtors and Debtors in Possession*

**EXHIBIT A**
**Liquidation Analysis**

| Assets | Gross Property Value | Total Encumbrances | Costs of Sale | Amount Exempt | Subtotals | |
|---|---|---|---|---|---|---|
| Real property | $1,511,000.00 | $1,009,837.00 | $151,100.00 | $50,000.00 | | $300,063.00 |
| Motor vehicles (cars, etc.) | $32,900.00 | $- | $3,290.00 | $12,003.00 | $ | 17,607.00 |
| Non-pub. traded stock and int in businesses | $26,700.00 | $- | $2,670.00 | $1.00 | $ | 24,029.00 |
| | | | | | | |
| | | | | Subtotal to Distribute | $ | 341,699.00 |
| | | | | Less Chap 7 Fees | $ | (70,368.00) |
| | | | | **Net Liquidation Amount** | **$** | **271,331.00** |

# EXHIBIT B

# BUDGET PROJECTIONS[1]

---

[1] Explanatory Notes for Projections:

1. Expenses – Phone:  Zero shown because this expense is paid by Corner Stone.
2. Expenses – Gas – LP – Tank is nearly full; Debtors expect to get through the budget period as shown with needing to refill.  To the extent the Dobsons may exceed Gas – LP expenses as budgeted, they will attempt to conserve from the Food Housekeeping Supplies budget line item to offset.
3. Expenses – Water and Sewer – Water effectively accounted for in the Electric bill because the house uses electric pump for well water (otherwise free) and septic system.
4. Expenses – Internet – Paid by Corner Stone.
5. Expenses – Vehicle Fuel – This is a relatively low amount because primarily paid by Corner Stone.  To the extent the Dobsons may exceed fuel expenses as budgeted on a given month, they will attempt to conserve from the Food Housekeeping Supplies budget line item to offset.
6. Expenses – Food and Housekeeping Supplies – Dobsons also care for Mr. Dobson's disabled sister who lives part time in the home.  Also includes daughter (24) at home full time and grandson (14) (late son's son).
7. Expenses – Software / Coconstruct to be paid by Corner Stone.

Tommy & Christine Dobson

# 9 Month Personal Financial Summary

**2023**

| MONTH | Beginning | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | End of Month Year End Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash on hand (beginning of month) | | | | | $11,243.36 | $4,479.89 | $1,218.35 | $3,028.00 | $7,568.71 | $10,209.42 | $12,850.13 | $15,490.84 | $18,131.55 | $20,772.26 |

| CASH RECEIPTS (Actual) | | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tommy - Signature Design Build Income (Salary) | | | | | $0.00 | $0.00 | $2,219.93 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $22,199.33 |
| Tommy - Signature Design Build (Profit Distribution) | | | | | $0.00 | $0.00 | $500.00 | $500.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $6,500.00 |
| Tommy - Income Plumb Line & Corner Stone (Salary) | | | | | $5,274.88 | $4,219.90 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $39,034.22 |
| Tommy - Plumb Line/ Corner Stone (Profit Distribution) | | | | | $0.00 | $0.00 | $0.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $15,000.00 |
| Tommy - Truck / Vehicle Stipend | | | | | $0.00 | $1,725.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $5,750.00 |
| Tommy - (P.L./C.S. & SDB ) Office Rent paid by Corner Stone | | | | | $0.00 | $0.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $20,825.00 |
| Tommy - Other | | | | | $687.53 | $2,493.12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,180.65 |
| Christine - Income Signature Design Build Income (Salary) | | | | | $0.00 | $0.00 | $1,765.53 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $17,655.33 |
| Christine - Income Plumb Line & Corner Stone ( Salary) | | | | | $4,193.87 | $3,355.10 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $31,034.53 |
| TOTAL CASH RECEIPTS | | | | | $10,156.28 | $11,793.12 | $15,610.47 | $20,103.20 | $20,703.20 | $20,703.20 | $20,703.20 | $20,703.20 | $20,703.20 | $161,179.07 |

# Personal Expenses

| CASH PAID OUT  (Expenses) | | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BANKRUPTCY PLAN PAYMENTS** | | | | | | | | | | | | | | |
| Subchapter 5 Plan Payments - Per Month | | | | | $2,000.00 | $0.00 | $1,000.00 | $1,000.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $21,500.00 |
| **HOUSING & UTILITIES** | | | | | | | | | | | | | | |
| Mortgage or rent (Shell Point) | | | | | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $50,992.65 |
| 2nd. Mortgage - Atlantic Union | | | | | $0.00 | $0.00 | $0.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $11,382.00 |
| Phone | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Electricity | | | | | $477.98 | $479.49 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $5,857.47 |
| Gas - L.P. | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Water and sewer | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cable & Internet | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Waste removal (Acct. No. 7466) | | | | | $130.60 | $65.30 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $1,105.83 |
| Maintenance or repairs (Filters, Salt Treatment, Lawn, Etc.) | | | | | $161.04 | $420.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $3,381.04 |
| Supplies - Misc. | | | | | $0.00 | $35.98 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $385.98 |
| Other - (HOA Dues & Misc. Fee's) | | | | | $845.05 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $845.05 |
| **Total** | | | | | $7,280.52 | $6,666.62 | $6,945.84 | $8,842.84 | $8,842.84 | $8,842.84 | $8,842.84 | $8,842.84 | $8,842.84 | $73,950.02 |
| **TRANSPORTATION** | | | | | | | | | | | | | | |
| Vehicle payment | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Rental & Misc. | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Vehicle Insurance ( less in April - good driving app) once per yr | | | | | $147.72 | $367.08 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $3,085.06 |
| Licensing  (DMV, Inspections, Etc) | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Vehicle Fuel | | | | | $114.42 | $63.59 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $528.01 |
| Vehicle Maintenance | | | | | $0.00 | $3,233.81 | $4.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $3,537.81 |
| Other (Parking Fees, Rentals, Etc.) | | | | | $0.00 | $190.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $330.00 |

| MONTH | Beginning | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | End of Month Year End Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | | | | | $262.14 | $3,854.48 | $441.18 | $487.18 | $487.18 | $487.18 | $487.18 | $487.18 | $487.18 | $7,480.88 |
| **INSURANCE** | | | | | | | | | | | | | | |
| Home (Built Into Mortgage) | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Health | | | | | $2,213.42 | | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $17,707.36 |
| Life | | | | | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $2,619.45 |
| Other | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | | | | | $2,504.47 | $291.05 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $20,328.81 |
| **FOOD/HOUSEKEEPING (Groceries, Meals, Etc)** | | | | | | | | | | | | | | |
| Food and housekeeping supplies | | | | | $2,529.78 | $2,124.46 | $1,832.33 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $17,586.57 |
| Total | | | | | $2,529.78 | $2,124.46 | $1,832.33 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $17,586.57 |
| **PETS** | | | | | | | | | | | | | | |
| Food / Care / Veterinarian | | | | | $366.78 | $85.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $1,151.78 |
| Total | | | | | $366.78 | $85.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $1,151.78 |
| **PERSONAL CARE (Medical Co-pay, clothing, etc.)** | | | | | | | | | | | | | | |
| Medical (Co-pay, Prescriptions, Etc) | | | | | $829.30 | $718.66 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $5,047.96 |
| Hair Cut | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Clothing | | | | | $0.00 | $158.83 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $1,208.83 |
| Speacialty Cleaning | | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Other misc food or beverage | | | | | $0.00 | $42.40 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $147.40 |
| Organization dues or fees | | | | | $202.09 | $0.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $433.09 |
| Total | | | | | $1,031.39 | $919.89 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $6,837.28 |
| **ENTERTAINMENT** | | | | | | | | | | | | | | $0.00 |
| Recreation / Entertainment / Holiday | | | | | $745.67 | $914.16 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $2,219.83 |
| Total | | | | | $745.67 | $914.16 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $2,219.83 |
| **Business Costs for Reimbursements** | | | | | | | | | | | | | | |
| Software ( Coconstruct for DHI) | | | | | $199.00 | $199.00 | $199.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $597.00 |
| Total | | | | | $199.00 | $199.00 | $199.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $597.00 |
| **MONTHLY SUBTOTAL EXPENSES** | | | | | $16,919.75 | $15,054.66 | $13,800.82 | $15,562.49 | $18,062.49 | $18,062.49 | $18,062.49 | $18,062.49 | $18,062.49 | $151,650.17 |
| **Cash on hand (end of month)** | | | | | $4,479.89 | $1,218.35 | $3,028.00 | $7,568.71 | $10,209.42 | $12,850.13 | $15,490.84 | $18,131.55 | $20,772.26 | $93,749.14 |
| **NET MONTHLY (Monthly cash reciepts minus monthly expenses)** | | | | | ($6,763.47) | ($3,261.54) | $1,809.65 | $4,540.71 | $2,640.71 | $2,640.71 | $2,640.71 | $2,640.71 | $2,640.71 | $9,528.90 |

Tommy & Christine Dobson

# 12 Month Personal Financial Summary

**2024**

| MONTH | Beginning | Jan. - 24 | Feb. - 24 | Mar. - 24 | 24-Apr | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | End of Month Year End Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash on hand (beginning of month)** | | 20,772.26 | 22,151.93 | 23,531.60 | 24,911.27 | 26,290.94 | 27,670.62 | 27,950.29 | 28,229.96 | 28,509.63 | 28,789.30 | 22,151.93 | 22,151.93 | $        22,431.60 |

| CASH RECEIPTS (Actual) | | Jan. - 24 | Feb. - 24 | Mar. - 24 | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tommy - Signature Design & Consulting Income (Salary) | | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | $3,329.90 | **$39,958.80** |
| Tommy - Signature Design & Consulting (Profit Distribution) | | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | **$19,500.00** |
| Tommy - Income Plumb Line & Corner Stone (Salary) | | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | $4,219.92 | **$50,639.04** |
| Tommy - Plumb Line/ Corner Stone (Profit Distribution) | | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | $3,500.00 | **$37,000.00** |
| Tommy - Truck / Vehicle Reimbursement | | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | $575.00 | **$6,900.00** |
| Tommy - (P.L./C.S. & SHDC ) Office Rent, Electric, Internet, Tel, Etc Reimbursement | | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | $2,975.00 | **$35,700.00** |
| Tommy - Other | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| Christine - Income Signature Design Build Income (Salary) | | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | $2,648.30 | **$31,779.60** |
| Christine - Income Plumb Line & Corner Stone ( Salary) | | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | $3,355.08 | **$40,260.96** |
| **TOTAL CASH RECEIPTS** | | $        20,703.20 | $        20,703.20 | $        20,703.20 | $20,703.20 | $20,703.20 | $22,603.20 | $22,603.20 | $22,603.20 | $22,603.20 | $22,603.20 | $22,603.20 | **$261,738.40** |

# Personal Expenses

| CASH PAID OUT  (Expenses) | | Jan. - 24 | Feb. - 24 | Mar. - 24 | 24-Apr | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BANKRUPTCY PLAN PAYMENTS** | | | | | | | | | | | | | | |
| Subchapter 5 Plan Payments - Per Month | | **$5,000.00** | **$5,000.00** | **$5,000.00** | **$5,000.00** | **$5,000.00** | **$8,000.00** | **$8,000.00** | **$8,000.00** | **$8,000.00** | **$8,000.00** | **$8,000.00** | **$81,000.00** |
| **HOUSING & UTILITIES** | | | | | | | | | | | | | | |
| Mortgage or rent (Shell Point) | | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $5,665.85 | $67,990.20 |
| 2nd. Mortgage - Atlantic Union | | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $1,897.00 | $22,764.00 |
| Phone | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Electricity | | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $8,400.00 |
| Gas - L.P. | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Water and sewer | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cable & Internet | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Waste removal (Acct. No. 7466) | | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $129.99 | $1,559.88 |
| Maintenance or repairs (Filters, Salt Treatment, Lawn, Etc.) | | $161.04 | $161.04 | $161.04 | $161.04 | $161.04 | $161.04 | $161.04 | $161.04 | $161.04 | $161.04 | $161.04 | $1,932.48 |
| | | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $600.00 |
| | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total** | | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$8,603.88** | **$103,246.56** |
| **TRANSPORTATION** | | | | | | | | | | | | | | |
| Vehicle payment | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Rental & Misc. | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Vehicle Insurance ( less in April - good driving app) once per yr | | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $367.18 | $4,406.16 |
| Licensing  (DMV, Inspections, Etc) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Vehicle Fuel | | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $600.00 |
| Vehicle Maintenance | | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $600.00 |
| Other (Parking Fees, Rentals, Etc.) | | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $240.00 |
| **Total** | | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$487.18** | **$5,846.16** |
| **INSURANCE** | | | | | | | | | | | | | | |
| Home (Built Into Mortgage) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Health | | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $2,213.42 | $26,561.04 |
| Life | | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $291.05 | $3,492.60 |
| Other | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| MONTH | Beginning | Jan. - 24 | Feb. - 24 | Mar. - 24 | 24-Apr | 24-May | 24-Jun | 24-Jul | 24-Aug | 24-Sep | 24-Oct | 24-Nov | 24-Dec | End of Month Year End Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | | 2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $2,504.47 | $30,053.64 |
| **FOOD/HOUSEKEEPING (Groceries, Meals, Etc)** | | | | | | | | | | | | | | |
| Food and housekeeping supplies | | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $22,200.00 |
| Total | | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $1,850.00 | $22,200.00 |
| **PETS** | | | | | | | | | | | | | | |
| Food / Care / Veterinarian | | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $1,200.00 |
| Total | | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $1,200.00 |
| **PERSONAL CARE (Medical Co-pay, clothing, etc.)** | | | | | | | | | | | | | | |
| Medical (Co-pay, Prescriptions, Etc) | | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $1,200.00 |
| Hair Cut | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Clothing | | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $1,800.00 |
| Medical (Co-pay, Prescriptions, Etc) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Other misc food or beverage | | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $15.00 | $180.00 |
| Organization dues or fees | | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $33.00 | $396.00 |
| Total | | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $698.00 | $8,376.00 |
| **ENTERTAINMENT** | | | | | | | | | | | | | | |
| Recreation / Entertainment / Holiday | | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $960.00 |
| Total | | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $80.00 | $960.00 |
| **ENTERTAINMENT** | | | | | | | | | | | | | | |
| Software ( Coconstruct for DHI) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **MONTHLY SUBTOTAL EXPENSES** | | $19,323.53 | $19,323.53 | $ 19,323.53 | $ 19,323.53 | $ 19,323.53 | $ 22,323.53 | $ 22,323.53 | $ 22,323.53 | $ 22,323.53 | $ 22,323.53 | $ 22,323.53 | $ 22,323.53 | $419,964.72 |
| **Cash on hand (end of month)** | | $ 22,151.93 | $ 23,531.60 | $ 24,911.27 | $ 26,290.94 | $ 27,670.62 | $ 27,950.29 | $ 28,229.96 | $ 28,509.63 | $ 28,789.30 | $ 22,151.93 | $ 22,151.93 | $ 22,431.60 | |
| **NET MONTHLY (Monthly cash recIepts minus monthly expenses)** | | $ 1,379.67 | $ 1,379.67 | $ 1,379.67 | $ 1,379.67 | $ 1,379.67 | $ 279.67 | $ 279.67 | $ 279.67 | $ 279.67 | $ 279.67 | $ 279.67 | $ 279.67 | |